Orly Taitz, Esq
Attorney & Counselor at Law
26302 La Paz, Suite 211
Mission Viejo Ca 92691
ph. 949-683-5411
fax 949-586-2082
California Bar ID No. 223433
(Application for Admission Pro Hac Vice
U.S.D.C. Middle District of Florida to be
Submitted July 24, 2009)

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
801 North Florida Avenue, #218
Tampa, Florida 33602-3800

| | | |
|---|---|---|
| MAJOR STEFAN FREDERICK COOK, §<br>    Plaintiff, §<br>  §<br>v. §<br>  §<br>SIMTECH, INC., §<br>LARRY GRICE, CEO OF SIMTECH, §<br>DEFENSE SECURITY SERVICES, §<br>COLONEL LOUIS B. WINGATE, §<br>DR. ROBERT M. GATES, UNITED §<br>STATES SECRETARY OF DEFENSE, §<br>BARACK HUSSEIN OBAMA, *de facto* §<br>PRESIDENT of the UNITED STATES, §<br>    Defendants. § | Civil Action Number:<br><br>**8:09-cv-01382-RAL-EAJ**<br><br><br><br>TRIAL-BY-JURY DEMANDED<br>Pursuant to 28 USC §1861 and<br>Seventh Amendment | |

## COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT, AND INJUNCTIVE RELIEF

1.    **Comes now the Plaintiff Stefan Frederick Cook with this Complaint, Declaratory Judgment, and Application for a Temporary Restraining Order and Preliminary Injunction to preserve the status quo and prevent irreparable injury to his career.**

2.    **The specific relief sought is an order reinstatement in his civilian employment at SIMTECH, INC., along with protection from the Secretary and Department of Defense, Defense Security Services**

*Complaint for Damages, Declaratory Judgment, and*          1
*Rule 65 Application for TRO and Preliminary Injunction*

Agency, and the President from further retaliation for Plaintiff's challenge to the President's constitutional authority as Commander-in-Chief[1].

3.   Plaintiff and Applicant Stefan Frederick Cook herein alleges that the Department of Defense, acting by and through the Defense Security Services (DSS) and Special Security Office (Director Don Marchok, MacDill AFB) as well as other unknown agencies, has formulated and launched a program of defamation and tortious interference with contractual and advantageous business and economic relations in retaliation against him for the exercise of his First Amendment Right to Petition for redress of grievances which threatens to destroy his career and good name.

4.   Just over one week ago, July 14, 2009, Plaintiff/Applicant Stefan Frederick Cook was terminated from his civilian employment at SIMTECH, INC., by its CEO LARRY GRICE, who explained that Plaintiff was being terminated as a direct result of DOD pressure

---

[1] Plaintiff filed his Application for Temporary Restraining Order and Preliminary Injunction with the Court on July 22, 2009. On July 23, 2009, the Court rejected this filing without prejudice for failure to comply with a local rule of the Middle District of Florida (not obviously mandated by Rule 65 of the Federal Rules of Civil Procedure or known practice in other districts) that a complaint had not been filed together with the Application. This complaint is filed within two days of the original Application for TRO and Preliminary Injunction and the Plaintiff moves and requests that this case be fully reinstated and the Complaint accepted and the Application for TRO be reactivated on the grounds that the pro se Plaintiff and his out-of-state counsel were unaware of the unusual local rule referred to by the Court in Document 3 filed in this case. (Furthermore, for reasons of economy, all References to Exhibits in this Complaint refer to the Exhibits filed and attached to the July 22, 2009, Application for Temporary Restraining Order and Preliminary Injunction, which is incorporated by reference as if fully copied and restated herein below).

*Complaint for Damages, Declaratory Judgment, and*                                    2
*Rule 65 Application for TRO and Preliminary Injunction*

which amounted to threats and extortion against SIMTECH and GRICE. For all practical purposes,

5.    Plaintiff Stefan Frederick Cook submits that SIMTECH and GRICE are as much victims of Department of Defense misconduct as he is, so that (in his complaint, to follow) Plaintiff will seek to realign SIMTECH and GRICE as INVOLUNTARY PLAINTIFFS' pursuant to Rule 19(a)(2) of the Federal Rules of Civil Procedure.

6.    Plaintiff files this Complaint for Damages, Declaratory Judgment, and Positive (Mandatory) Injunctive Relief in the form of a Temporary Restraining Order and/or Preliminary Injunction restoring his employment with SIMTECH, compelling Grice to reinstate his employment.

7.    Plaintiff further seeks a Prohibitory (Negative) Temporary Restraining Order and/or Preliminary Injunction forbidding the Department of Defense from taking any further retaliatory or "blacklisting" operations against either Plaintiff Cook or Defendants (Involuntary Plaintiffs) Larry Grice and Simtech, Inc., according to the following Florida State statute 250.481: which may be brought in Federal court as supplemental jurisdiction pursuant to 28 U.S.C. §§1346, 1367, & 1492:

> Florida Statutes TITLE XVII-MILITARY AFFAIRS AND RELATED MATTERS, CHAPTER 250 MILITARY AFFAIRS
>
> 250.481   Reserve   components;   employment   discrimination prohibited.--Any person who seeks or holds an employment position may not be denied employment or retention in employment, or any promotion or advantage of employment,

because of any obligation as a member of a reserve component of the Armed Forces.

8.    Plaintiff Major Stefan Frederick Cook submits and contends that he had an absolute and unassailable obligation to question the legality of his deployment orders. And, for this reason, and this reason alone, because he obeyed his oath and moral conscience, he was terminated from employment.

9.    Under the 1st and 9th Amendments, because Cook's termination was a direct result of his questioning the legality of the chain of command underlying his deployment orders (Cook took a military oath to question all orders if he believes those orders might be unlawful) and actually questioned those orders, the DOD and DSS threatened Cook's employer SIMTECH acting by and through to fire him which amounts to coercion to commit the crime of extortion on the part of the Department of Defense and the Defense Security Services Agency.

10.   The threats that the DSS made to Cook's employer to force his employer to terminate Cook, rise to the level of extortion.

11.   Circumstances suggest almost conclusively that the DSS told Larry Grice and SIMTECH that if they did not immediately terminate Cook, Simtech's status as a government contractor would go the way of Cook's career in the Army.

12.   Florida state statutes are clear that threats and extortion are unlawful. Florida Statutes 836.05, 777.04,

13.   **Plaintiff will suffer irreparable, in fact incalculable, injury if this preliminary injunction is not granted. The actions against the Plaintiff, known to have been initiated and taken by the Department of Defense, are plainly illegal and in fact constitutionally forbidden,**

so that Plaintiff has a substantial likelihood of prevailing on the merits of this action.

14. The cost of compliance with the TRO and Preliminary Injunction to the Department of Defense is minimal (and might actually save expenditure of government funds and conserve resources), while the cost to Plaintiff Major Cook of Defamation and interference is immense, so that the balance of equities favors the granting of this TRO and injunction without bond.

15. Finally, because of the outrageous and illegal nature of the repressive and retaliatory conduct of the Department of Defense, Public Policy favors the entry of this Temporary Restraining order and, upon hearing a Preliminary Injunction during the pendency of this action.

**BACKGROUND AND PREDICATES TO THIS COMPLAINT FOR DECLARATORY JUDGMENT, DAMAGES, AND RULE 65 APPLICATION FOR INJUNCTIVE RELIEF**

16. On or about June 10, 2009, Plaintiff Major Stefan Frederick Cook received from the Defendants in this cause what appeared to be facially valid orders mobilizing him to active duty as an information systems specialist with the United States Army at Fort Benning for frontline "GWOT[2]" service in Afghanistan on July 15-18, 2009.

17. Plaintiff, a 21 year decorated veteran of the U.S. Army Reserve with 4 prior years of active service in a dozen foreign countries, was concerned on moral, ethical, and constitutional grounds, about the *de jure* legitimacy of the U.S.

---

[2] "Global War on Terrorism."

Army chain-of-command under the *de facto* Commander-in-Chief Barack Obama.

18.   On April 21, 2009, acting in conjunction with other military personnel, and acting by and through his undersigned counsel, Plaintiff had submitted a demand substantively in accord with Article 138 of the Uniform Code of Military Justice (Exhibit A).

19.   On July 3, 2009, Plaintiff's counsel received summary notice from Captain James Crawford, Legal Counsel for Admiral James Mullen, Chairman of Joint Chiefs of Staff, that there was no recourse against or concerning the allegedly fatal constitutional defect in the chain of command through the military grievance procedure set forth in Article 138 (Exhibit B).

20.   Having thus substantially attempted to satisfy administrative process and been rejected at the highest levels, Plaintiff filed an Original Application for TRO on Friday July 10, 2009 in the Middle District of Georgia (Columbus Division, where Fort Benning is located)(2009cv00082 Judge Land).

21.   This original application demanded that the Courts fill the gap left open by Article 138 and conclusively resolve all legal, ethical, and constitutional questions concerning the military chain of command raised by the April 21, 2009, letter, and establish by declaratory judgment a conclusive remedy for officers to question the legality or lawful status of orders, as officers are required to do both by their oaths of office and by the Uniform Code of Military Justice (see below).

22.   On Tuesday, July 14, 2009, less than three business days later, Plaintiff's deployment to Afghanistan was revoked by order of Colonel Louis B. Wingate from the Army Human Resources Command in St. Louis.

23. This unexpected unilateral action on the part of the Department of Defense Defendants (Obama, Gates, et. Al.) did not in any way, shape or form, "moot" the application for TRO, in that the new order revoking prior orders to active duty was apparently subject to all the same objections and defects in the chain of command. Plaintiff's original TRO was then and there amended and resubmitted as an Application for Preliminary Injunction.

24. The simple and plainly apparent truth is that, by revoking his orders the Department of Defense attempted in Georgia and for that one moment at least successfully evaded review of the two underlying constitutional issues, namely (1) the lawful status and constitutional validity of any chain of command starting with an unconstitutional President, and (2) the legal and constitutional avenues open to an officer to comply with his oath to obey only lawful orders by challenging their lawful status.

25. These key issues underlie Plaintiff's Complaint for Declaratory Judgment (under no circumstances should the Court construe this case as violating the precept that "[t]here is no such thing as a suit for a traditional injunction in the abstract." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004).

26. The amended Application in Georgia filed July 15, 2009, covered both the possibility of future orders and to prevent negative collateral consequences such as retaliation against Major Stefan Frederick Cook (which had already begun on July 14, 2009) including possible violations of the general Federal and specific military whistleblower acts, as well as the First and Ninth Amendment civil rights of Major Stefan Frederick Cook to challenge the chain of command in the U.S military.

*Complaint for Damages, Declaratory Judgment, and*                    7
*Rule 65 Application for TRO and Preliminary Injunction*

27.  These possible violations are the subject for damages actions to be filed as part of the complaint in chief, after submission of a proper *Bivens* demand pursuant to 28 U.S.C. §2401(b).

28.  It was already obvious that this case had and still has the potential to be converted into a class action on behalf of all military servicemen and women who require the means of establishing the legality of their orders with certainty[3], and the certification of a class action will be sought in the complaint to be filed herein.

## VENUE IS PROPER IN MIDDLE DISTRICT OF FLORIDA, MOOTNESS

29.  The Middle District of Florida plainly has the authority to hear this case pursuant to 28 U.S.C. §§1346 and 1402(a)-(b).

30.  Further, even if the original orders have been revoked against Stefan Frederick Cook, the Army should not be allowed to evade review of the questions presented as matters for DECLARATORY JUDGMENT pursuant to both 28 U.S.C. §§2201-2202 and 42 U.S.C. §§1983-1988(a) merely by intentionally revoking the orders once challenged, and a TRO and Preliminary Injunction are appropriate regarding the two key constitutional questions noted above, concerning (1) the validity of any orders issued under a chain of command originating from Barack Hussein Obama and (2) the urgent need for a legal and constitutional avenue to be open by which officers may challenge any and all orders, and aspects of their orders, which might appear to them reasonably to be unlawful and therefore a violation of the officer's oath.

---

[3] Numerous other officers have expressed a desire to join this lawsuit although they do not have reason or standing to participate in the present TRO or Rule 65 Application.

31.   Plaintiff's Application for TRO and Preliminary Injunction presents: 1) an unsettled legal issues of public interest and importance and 2) an issue of a recurring nature that will escape review unless the Court exercises its discretionary jurisdiction.

32.   Furthermore, the Middle District of Georgia decided to eschew its responsibility and to disclaim jurisdiction and in essence instructed Plaintiff to direct all further complaints in this matter to the Middle District of Florida where all or a great preponderance of the transactions or occurrences giving rise to this lawsuit took place.

33.   Rather than risk further inattention to his claims for immediate protection, Plaintiff has here followed Judge Land's admonishment and come to file this present Complaint for Damages, Declarator Judgment, and Application for Mandatory Injunctive Relief to restore his employment and Prohibitive Injunctive Relief to prevent further retaliation against the Plaintiff and/or his employer SIMTECH, INC., and/or his employer's CEO Larry Grice.

34.   Plaintiff seeks to protect himself and his employer SIMTECH and his employer's CEO Larry Grice as Involuntary Plaintiff either directly and openly through termination of government contracts and eligibility or through covert "blacklisting" and "extortionate threats" such as those apparently used against Grice and Simtech to procure the full measure of governmental retaliation sought against the Plaintiff.

## DOD RETALIATION AGAINST MR. COOK WAS SWIFT AND BRUTAL AND APPEARS TO BE ONGOING

35.   Retaliation began not later than July 14, 2009, against Plaintiff Stefan Frederick Cook for the July 10, 2009, exercise of his First Amendment right to petition for redress of grievances, and Plaintiff Cook accordingly here seeks a prohibitory injunction against the continuance or full implementation of this official governmental retaliation.

36.   In the alternative, Plaintiff seeks a Positive Injunction, writ of mandamus, order to show cause, or rule *nisi* be issued to the Department of Defense commanding it to cease, cure, or remedy all retaliation against Plaintiff Cook, including all interference with, extortionate threats to, or coercive pressure applied to Defendants (Involuntary Plaintiffs?) Simtech and Grice.

37.   The circumstances are as follows:

Late on Tuesday afternoon, July 14, 2009, at around about 4:30 pm, Plaintiff Stefan Frederick Cook returned a call to an unknown telephone call from (813) 828-5884 and was told that his services were no longer required in Afghanistan and that he need not report for duty.  In addition Plaintiff received an e-mail with a written revocation order attached from Master Sargent Miguel Matos (Exhibit C).

38.   Once apprised of the revocation, Plaintiff Major Cook called his civilian boss, the CEO of Simtech, Inc., a closely held corporation that does DOD contracting in the general field of information technology/systems integration, at which Plaintiff Major was employed until taking a Military Leave of Absence on Friday July 10, 2009, a senior systems engineer and architect, in preparation for

his deployment to Afghanistan.  (Plaintiff has five Cisco Systems certifications in information technology dating from 2000 and just recertified in June 2009 for the Cisco Certified Design Expert qualification exam.)

39.  The CEO of Simtech, Inc., Larry Grice, explained to Plaintiff over a series of four conversations within the next two hours, that he had been terminated.  Grice told the Plaintiff that he would no longer be welcome in his former position at SOCOM but that Grice wanted to see whether he could find something within the company (Simtech, Inc.) for Cook.

40.  The upshot was that at this time Grice did not have anything for Plaintiff to do.  Grice told Plaintiff, in essence, that the situation had become "nutty and crazy", and that Plaintiff would no longer be able to work at his old position.

41.  Grice explained that he had been in touch with Defense Security Services (an agency of the Department of Defense[4], with regional offices located in SOCOM Headquarters at MacDill Air Force Base in Tampa, Florida), and that DSS had not yet made a determination whether Plaintiff Major Cook's clearances would be pulled, but Grice made clear to Cook that it was DSS who had compelled Cook's termination.

42.  Essentially, because of the "nutty and crazy" situation and the communications received from DSS was no longer employable by him at all.  For that reason, Grice was not optimistic about getting me another job at the

---

[4]    The Defense Security Service (DSS) is an agency of the United States Department of Defense (DoD). Within areas of DoD responsibility, DSS is tasked with facilitating personnel security investigations, supervising industrial security, and performing security education and awareness training. It is not a Federal law enforcement organization; it does not have police powers. Originally known as the Defense Investigative Service (DIS), DIS was established in 1972. DSS changed from DIS in 1999.

*Complaint for Damages, Declaratory Judgment, and*                      11
*Rule 65 Application for TRO and Preliminary Injunction*

company. Grice also reported to Plaintiff that there was some gossip that "people were disappointed in" the Plaintiff because they thought he was manipulating his deployment orders to create a platform for political purposes.

43. Grice then discussed Plaintiff's expectation of receiving final paychecks (including accrued leave pay) already owed, without any severance pay, and wished the Plaintiff well.

44. A federal agency (such as the Department of Defense, acting through the Defense Security Services Agency) clearly violates the Whistleblower Protection Act if it takes or fails to take (or threatens to take or fail to take) a personnel action with respect to any employee or applicant because of any disclosure of information by the employee or applicant that he or she reasonably believes evidences a violation of a law, rule or regulation; gross mismanagement; gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety.

45. What has happened in the present case of Stefan Frederick Cook is that a federal agency appears to have taken action against Stefan Frederick Cook's private employer, Simtech, Inc., which is a closely held corporation owned and operated by members of a single family, who are as much victims of the Department of Defense' heavy-handed interference with Plaintiff Cook's private-sector employment as is Plaintiff Cook himself.

## COUNT I: DECLARATORY JUDGMENT DEFINING
## AN OFFICER'S DUTY TO OBEY *LAWFUL* ORDERS:

46.   Plaintiff realleges ¶¶1-45 and incorporates the same by reference, as if fully

copied and restated herein.

47.   This Plaintiff, at the time of his original induction into service, took the

United States, military oath of an enlisted man, which reads:

> "I, Stefan Frederick Cook, do solemnly swear (or affirm) that I will
> support and defend the Constitution of the United States against all
> enemies, foreign and domestic; that I will bear true faith and
> allegiance to the same; and that I will obey the orders of the
> President of the United States and the orders of the officers
> appointed over me, according to the regulations and the Uniform
> Code of Military Justice. So help me God"

> Later, however, he took the oath of an officer of the United States Armed

Forces, as follows:

> "I, Stefan Frederick Cook, having been appointed an officer in the
> Army of the United States, as indicated above in the grade of Major
> do solemnly swear (or affirm) that I will support and defend the
> Constitution of the United States against all enemies, foreign or
> domestic, that I will bear true faith and allegiance to the same; that
> I take this obligation freely, without any mental reservations or
> purpose of evasion; and that I will well and faithfully discharge the
> duties of the office upon which I am about to enter; So help me
> God." (DA Form 71, 1 August 1959, for officers.)

48.   This oath is based on 5 U.S.C. §3331:

> An individual, except the President, elected or appointed to an
> office of honor or profit in the civil service or uniformed services,
> shall take the following oath: "I, AB, do solemnly swear (or affirm)
> that I will support and defend the Constitution of the United States
> against all enemies, foreign and domestic; that I will bear true faith
> and allegiance to the same; that I take this obligation freely, without
> any mental reservation or purpose of evasion; and that I will well
> and faithfully discharge the duties of the office on which I am about
> to enter. So help me God." This section does not affect other oaths
> required by law.

See also: http://www.history.army.mil/faq/oaths.htm

*Complaint for Damages, Declaratory Judgment, and*          13
*Rule 65 Application for TRO and Preliminary Injunction*

49.    An officer does not swear to obey the orders of the President.  Rather, he assumes the obligation to defend the Constitution against all enemies, foreign and domestic.

50.    Plaintiff Stefan Frederick Cook asks this Court to declare and adjudge that it is lawful, right and proper and in fact mandated by his oath that an officer, pursuant to his oath to defend against all enemies, foreign and domestic, should challenge the chain of command against, if evidence exists to support a reasonable suspicion in the officers mind, a possible Presidential Usurper.

51.    Plaintiff Stefan Frederick Cook asks this Court to declare and adjudge that if it were shown by clear-and-convincing evidence that a person took the office under false pretenses of constitutional qualifications), such person is a domestic enemy, and constitutes a clear and present danger as an enemy to the constitution and laws of the United States of America.

52.    The Founding Fathers had the foresight to protect and secure against a situation such as that now facing the United States.

53.    Plaintiff Stefan Frederick Cook asks this Court further to declare and adjudge that the officer's oath is and should always be, under the Constitution, construed as a safeguard to protect the Constitution against a corrupt elected government.

54.    Plaintiff Stefan Frederick Cook asks this Court to declare and adjudge that Officers have an obligation to defend the Constitution.

55.    The officer oath does not even mention following the UCMJ laws as does the enlisted oath.  Furthermore, Plaintiff Stefan Frederick Cook carries with him

a card entitled "Army Values" issued by the United States Army (Exhibit D), which commands in part as follows:

"Bear truth faith and allegiance to the United States Constitution, the Army, your unit, and other soldiers."

"Put the welfare of the Nation, the army, and your subordinates before your own."

"Do what's right, legally and morally."

"Face fear, danger, or adversity (physical or moral)."

56.    Title 10, Subtitle A, Part II of the United States Code contains the Uniform Code of Military Justice (UCMJ).  10 U.S.C. §890 (ART.90), makes it an offence subject to court-martial if any military personnel "willfully disobeys a **lawful** command of his superior commissioned officer," 10 U.S.C. §891 (ART.91) "**lawful** order of a warrant officer", and most importantly, 10 U.S.C. §892 (ART.92) provides court-martial for any officer who

(1) violates or fails to obey any **lawful** general order or regulation;
(2) having knowledge of any other **lawful** order issued by a member of the armed forces, which it is his duty to obey, fails to obey the order; or
(3) is derelict in the performance of his duties;

57.    In each case, Plaintiff submits that it is implicit though not expressly stated that an officer is and should be subject to court-martial, because **he will be derelict in the performance of his duties, if he does not inquire as to the lawfulness, the legality, the legitimacy of the orders which he has received, whether those orders are specific or general.**

58.    Unfortunately the Uniform Code of Military Justice does not provide a means for ascertaining the legality of orders, and accordingly, this Plaintiff is left

with no choice but recourse to the ordinary civil courts of the United States to seek a determination of what he considers to be a question of paramount constitutional and legal importance: the validity of the chain of command under a President whose election, eligibility, and constitutional status appear open to serious question.

## COUNT II:
## PROBABLE CAUSE FOR SUSPICION OF THE PRESIDENT'S OPENNESS AND HONESTY: EXECUTIVE ORDERS OF Jan. 21, 2009

59.    Plaintiff realleges ¶¶1-59 and incorporates the same by reference as if fully copied and restated herein below.

60.    Plaintiff asks this Court to declare and adjudge that a serious question exists regarding the legitimacy of Presidential Conduct, amounting to Probable Cause for Suspicion of lack of constitutional qualifications and possible status as a domestic enemy, or usurper contrary and dangerous to the Constitution of the United States, when a President enters, on his first full day in office, the following order concerning Presidential Archives, which was worthy of Richard M. Nixon at the height of Watergate (See also Exhibit G):

**Monday,**
**January 26, 2009**
## Part VIII
# The President
**Executive Order 13489—Presidential Records**
**Executive Order 13490—Ethics Commitments by Executive Branch Personnel**
**Memorandum of January 21, 2009—Senior White House Staff Pay Freeze**
## Presidential Documents
4669

Federal Register
Vol. 74, No. 15
Monday, January 26, 2009
Title 3—

# The President

Executive Order 13489 of January 21, 2009

## Presidential Records

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to establish policies and procedures governing the assertion of executive privilege by incumbent and former Presidents in connection with the release of Presidential records by the National Archives and Records Administration (NARA) pursuant to the Presidential Records Act of 1978, it is hereby ordered as follows:

Section 1. Definitions. For purposes of this order:

(a) "Archivist" refers to the Archivist of the United States or his designee.

(b) "NARA" refers to the National Archives and Records Administration.

(c) "Presidential Records Act" refers to the Presidential Records Act, 44 U.S.C. 2201–2207.

(d) "NARA regulations" refers to the NARA regulations implementing the Presidential Records Act, 36 C.F.R. Part 1270.

(e) "Presidential records" refers to those documentary materials maintained by NARA pursuant to the Presidential Records Act, including Vice Presidential records.

(f) "Former President" refers to the former President during whose term or terms of office particular Presidential records were created.

(g) A "substantial question of executive privilege" exists if NARA's disclosure of Presidential records might impair national security (including the conduct of foreign relations), law enforcement, or the deliberative processes of the executive branch.

(h) A "final court order" is a court order from which no appeal may be taken.

Sec. 2. Notice of Intent to Disclose Presidential Records. (a) When the Archivist provides notice to the incumbent and former Presidents of his intent to disclose Presidential records pursuant to section 1270.46 of the NARA regulations, the Archivist, using any guidelines provided by the incumbent and former Presidents, shall identify any specific materials, the disclosure of which he believes may raise a substantial question of executive privilege. However, nothing in this order is intended to affect the right of the incumbent or former Presidents to invoke executive privilege with respect to materials not identified by the Archivist. Copies of the notice for the incumbent President shall be delivered to the President (through the Counsel to the President) and the Attorney General (through the Assistant Attorney General for the Office of Legal Counsel). The copy of the notice for the former President shall be delivered to the former President or his designated representative.

(b) Upon the passage of 30 days after receipt by the incumbent and former Presidents of a notice of intent to disclose Presidential records, the Archivist may disclose the records covered by the notice, unless during that time period the Archivist has received a claim of executive privilege by the incumbent or former President or the Archivist has been instructed by the incumbent President or his designee to extend the time period for a time certain and with reason for the extension of time provided in the notice. If a shorter period of time is required under the circumstances 4670 Federal Register/Vol. 74, No. 15/Monday, January 26, 2009/Presidential Documents set forth in section 1270.44 of the NARA regulations, the Archivist shall so indicate in the notice.

Sec. 3. Claim of Executive Privilege by Incumbent President. (a) Upon receipt of a notice of intent to disclose Presidential records, the Attorney General (directly or through the Assistant Attorney General for the Office of Legal Counsel) and the Counsel to the President shall review as they deem appropriate the records covered by the notice and consult with each other, the Archivist, and such other executive agencies as they deem appropriate concerning whether invocation of executive privilege is justified.

(b) The Attorney General and the Counsel to the President, in the exercise of their discretion and after appropriate review and consultation under subsection (a) of this section, may jointly determine that invocation of executive privilege is not justified. The Archivist shall be notified promptly of any such determination.

(c) If either the Attorney General or the Counsel to the President believes that the circumstances justify invocation of executive privilege, the issue shall be presented to the President by the Counsel to the President and the Attorney General.

(d) If the President decides to invoke executive privilege, the Counsel to the President shall notify the former President, the Archivist, and the Attorney General in writing of the claim of privilege and the specific Presidential records to which it relates. After receiving such notice, the Archivist shall not disclose the privileged records unless directed to do so by an incumbent President or by a final court order.

Sec. 4. Claim of Executive Privilege by Former President. (a) Upon receipt of a claim of executive privilege by a living former President, the Archivist shall consult with the Attorney General (through the Assistant Attorney General for the Office of Legal Counsel), the Counsel to the President, and such other executive agencies as the Archivist deems appropriate concerning the Archivist's determination as to whether to honor the former President's claim of privilege or instead to disclose the Presidential records notwithstanding the claim of privilege. Any determination under section 3 of this order that executive privilege shall not be invoked by the incumbent President shall not prejudice the Archivist's determination with respect to the former President's claim of privilege.

(b) In making the determination referred to in subsection (a) of this section, the Archivist shall abide by any instructions given him by the incumbent President or his designee unless otherwise directed by a final court order. The Archivist shall notify the incumbent and former Presidents of his determination at least 30 days prior to disclosure of the Presidential records, unless a shorter time period is required in the circumstances set forth in section 1270.44 of the NARA regulations. Copies of the notice for the incumbent President shall be delivered to the President (through the Counsel to the President) and the Attorney General (through the Assistant Attorney General for the Office of Legal Counsel). The copy of the notice for the former President shall be delivered to the former President or his designated representative.

Sec. 5. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) authority granted by law to a department or agency, or the head thereof; or

(ii) functions of the Director of the Office of Management and Budget relating to budget, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

*Complaint for Damages, Declaratory Judgment, and*
*Rule 65 Application for TRO and Preliminary Injunction*                    18

4671
Federal Register/Vol. 74, No. 15/Monday, January 26, 2009/Presidential
Documents
Sec. 6. Revocation. Executive Order 13233 of November 1, 2001, is revoked.
THE WHITE HOUSE,
January 21, 2009.

## WHO IS THIS PLAINTIFF WHO DARES TO COMPASS THE KING? WHO DARES TO CHARGE THAT THE EMPEROR HAS NO CLOTHES?

61.     Plaintiff Major Stefan Frederick Cook is not a pacifist (See Military

Curriculum Vitae and Civilian Resumes Attached as Exhibits H & I, respectively).

He does not object to war or the use of military force in the implementation of

national policy or the enforcement of international law.  Above all, Plaintiff is not

a coward, he is not engaged in mutiny, sedition, insubordination, contempt,

disrespect, or any kind of resistance to any general or specific **lawful** order of

which he knows or has received notice.

62.     Plaintiff Major Stefan Frederick Cook realized and accepted as a matter of

political reality (although it is very hard for him to bear personally) that many

would, have, and will criticize or even shun him, saying that he is not acting in the

best interests of his country for trying to uphold the plain letter of the

Constitution.

63.     Others may, will, and already have cynically ridiculed this Plaintiff when,

as an officer responsible not only to obey those above him but to protect those

under his command, he comes to this Court asking for the right to establish the

legality of orders received not only for his own protection, but for the protection

of all enlisted men and women who depend on HIS judgment that the orders he

follows are legal.

64.   Above all, when Plaintiff Major Stefan Frederick Cook submitted and contended, as he continues to submit and contend, that he filed and will prosecute this lawsuit and seeks a preliminary injunction against the Defendants' enforcement of potentially illegal orders for the benefit of all servicemen and women and for the benefit all officers in all branches of the U.S. Military, he knew that those in power illegitimately may seek to injure his career, although frankly, he had no idea how fast they would work, or that his civilian career would be ended within five days of exercising his First Amendment Right to Petition for Redress of Grievances.

65.   Plaintiff knew that, by challenging the legitimacy of the President, he risked all and he did and continues to do so in the conscientious belief that he does so for not merely his own, but the general good. The United States Department of Defense has sought to punish Plaintiff and destroy his career;

COUNT III: MANDATORY INJUNCTION TO PROTECT PLAINTIFF

66.   Plaintiff realleges ¶¶1-65 and incorporates all the material allegations and legal contentions of the same by reference as if fully copied and restated herein.

67.   This United States District Court should use all of its equitable powers to remedy the injury already inflicted by the government, and to protect Plaintiff Stefan Frederick Cook and his former employer SIMTECH, INC., and SIMTECH'S CEO LARRY GRICE, from further retaliation and blacklisting.

68.   **REALIGNMENT OF PRIVATE PARTY DEFENDANTS SIMTECH, INC., AND LARRY GRICE AS INVOLUNTARY PLAINTIFFS**: The Court must recognize (and should enter a finding of fact as predicate to its order) that SIMTECH and GRICE never would have dared to file suit on their own after

witnessing the brutality of the Department of Defense' repression of Major Stefan Frederick Cook.

69.    The Court should recognize the reality of their status, suggested here, as an involuntary plaintiff aligned as real-parties-in interest by all the facts and circumstances of this case as Involuntary Plaintiffs alongside Major Cook.

## COUNT IV: Declaratory Judgment & Permanent Injunction
### *PLAINTIFF SEEKS A FIVE-PART DECLARATORTY JUDGMENT AS WELL AS A PERMANENT INJUNCTION TO PROTECT CONSCIENTIOUS DISOBEDIENCE TO UNLAWFUL ORDERS FROM RETALIATION*

70.    Plaintiff realleges ¶¶1-69 and incorporates the same by reference.

71.    ***PART A:*** Plaintiff asks this Court to find, declare, and adjudge that the Department of Defense Defendants have taken retaliatory action against this Plaintiff through DSS, and that Plaintiff has and will continue to suffer irreparable injury to his career from such retaliation, for which reason this Court should grant the mandatory and prohibitory injunctions sought and herein prayed for.

72.    The Plaintiff must now defend his civil rights, as well as those of all other officers similarly situated (but the formal FRCP Rule 23 application for certification of this complaint as a class action will be filed at a later date).

73.    ***PART B:*** Plaintiff prays that this Court will both enter a declaratory injunction defining, and an injunction to protect, preserve, and defend, Plaintiff's right and duty as an officer to exercise and enforce his constitutional right to petition for redress of grievances, including the incompleteness of the law regarding the identity and status of "lawful" orders, and to faithfully execute and perform his constitutional duty (oath of office as an officer) and above all his

*Complaint for Damages, Declaratory Judgment, and*          21
*Rule 65 Application for TRO and Preliminary Injunction*

honor and his good name against all those who would and have criticized him for making the decision to stand up and demand proof.

74.   ***Part C:***  The Plaintiff cannot escape from the dictates of his conscience, and the Court by its power to declare, delineate, construe, and apply the law and constitution as applied to this case, as well as render injunctions, should render and hand down sufficient orders to insulate the Plaintiff (and Private Party Defendants/Involuntary Plaintiffs) from governmental oppression upon and against, the well-informed and considered mandates of Plaintiff's conscience and his awareness, his educated consciousness, that all military personnel but especially commissioned officers have an obligation and a duty to only obey Lawful orders and indeed have an obligation to disobey Unlawful orders.

75.   ***Part D:*** **Plaintiff Stefan Frederick Cook asks this court to declare and adjudge that "unlawful orders" be defined for purposes of this case and for all posterity as including orders by the president that do not comply with the UCMJ, this is quite possibly the most important count and element of the present complaint for declaratory judgment, because the President can only be President and Commander-in-Chief according to the rule of law and the constitution.**

76.   Plaintiff's, and every officer's, primary and predominant moral and legal obligation is to the U.S. Constitution and not to those individuals who would issue unlawful orders, especially if those orders are in direct violation of the Constitution and the UCMJ.

77.     In the words of the Henry de Bracton, 13th century English Jurist in his *De Legibus et Consuetudinibus Angliae* (On the Laws and Customs of England, written during the reign of Henry III in the first fifty years after King John's ratification of *Magna Charta* on the field of Runnymede): *Non sub Homine sed sub Deo et Lege* (not under Man but Under God and Law), by which Bracton meant that the sovereign can only rule so long as he does so according to law and lawful custom and practice, so that a lawless sovereign is only a usurper and cannot command his subjects.  "A Democratic sovereign is only immune to the degree that he acts in and under the law:" *In Re Publica Non sub Regem sed sub Deo Juridique.*

78.     Nearly 800 years after both Runnymede and Bracton, Professor Hitomi Takemura of Kyushu University recently (December 5, 2008) published a book entitled: *International Human Right to Conscientious Objection to Military Service and Individual Duties to Disobey Manifestly Illegal Orders* (New York: Springer-Verlag).  This book stands as an international legal analysis of the duties of military officers, and it is significant, if not possibly somewhat ironic, that President Barack Hussein Obama has repeatedly argued that the United States should conform itself to international law and customs.

79.     *Part E:*  And, so, still further, Plaintiff seeks a judicial determination by declaratory judgment of whether or not there is a general duty to disobey all unlawful orders.

80.     Although this case is not the place to retry Lt. William Laws Calley and the My Lai Massacre  the question of lawful orders must be addressed in abstract---

how can an officer be certain of lawful orders when the administrative procedure provided for such resolution is denied or fails?

81.     Plaintiff asks this Court to declare and outline by declaratory judgment enabling officers to avoiding such disgraceful occurrences as My Lai and Abu Ghraib in the future by deciding, and even at the Preliminary Injunction ordering by way of positive mandate, for example, according to 42 U.S.C. §1988(a) that the army institute procedures and protect Plaintiff's, and all officers', access to courts,

82.     Plaintiff asks this Court to declare and adjudge the procedures and circumstances of when and how an officer, such as the Plaintiff, may seek judicial determination of the lawful or unlawful nature of an order based on a constitutional challenge to the chain of command originating from a probably ineligible President and Commander-in-Chief.

83.     Plaintiff files this suit to clarify how he can both obey all lawful orders and avoid dereliction of his duties so as to escape court-martial under the UCMJ if he does NOT question the legality of the orders he has received.

84.     Plaintiff seeks to avoid not only court-martial in this country, but also treatment as a war-criminal or terrorist, not eligible even for protection under the Geneva convention, if he were found to be a merely mercenary soldier in a private army of slaves, "owned" or controlled by an unconstitutional and therefore illegal commander, if he does not ask the question: "is this order legal?"

**COUNT V: NEVER BEFORE IN THE HISTORY OF THE UNITED STATES OF AMERICA---CONSCIENTIOUS OBJECTION TO AN UNCONSTITUTIONAL PRESIDENT?**

85.   Plaintiff realleges ¶¶1-84 and incorporates the same by reference as if fully copied and restated herein below.

86.   Plaintiff presents another key question in this case also as one of first impression, never before decided in the history of the United States: Is an officer entitled to refuse orders on grounds of conscientious objection to the legitimate constitutional authority of the current *de facto* Commander-in-Chief?

87.   In the alternative, is an officer entitled to a judicial stay of the enforcement of facially valid military orders where that officer can show evidence that the chain-of-command from the commander-in-chief is tainted by illegal activity?  In the alternative, does the issuance of orders based on a constitutionally infirm chain-of-command under Article II create or render military service as a mere "involuntary servitude" in violation of the Thirteenth Amendment which may be judicially enjoined?

88.   Plaintiff seeks injunctive relief against the United States Department of Defense, and each of Plaintiff's commanding officers, as expressly authorized by 5 U.S.C. §702.

89.   Specifically, Plaintiff alleges that he will suffer legally cognizable but irreparable injury because of agency (U.S. Department of Defense) action if the order attached as Exhibit A were to be enforced, and that Plaintiff is adversely affected and aggrieved by this agency action within the meaning of Article II, §§1-2 of the United States Constitution, and is entitled to judicial review thereof.

90.   This action is filed in this United States District Court for the Middle

*Complaint for Damages, Declaratory Judgment, and*          25
*Rule 65 Application for TRO and Preliminary Injunction*

District of Florida, which venue is appropriate pursuant to 28 U.S.C. §402 because of Plaintiff's residence and because the transactions and occurrences giving rise to this suit took place here.

91.    This suit is filed seeking injunctive and declaratory relief (although money damages under *Bivens* may be added after proper demand) and the Complaint was filed within 2 days of the filing of this Plaintiff's Original Application for Preliminary Injunction and after the Court dismissed the Application without prejudice on July 23, 2009. (As noted on page 2, above, all References to Exhibits in this Complaint refer to the Exhibits filed and attached to the July 22, 2009, Application for Temporary Restraining Order and Preliminary Injunction, which is incorporated by reference as if fully copied and restated herein below).

92.    Plaintiff states a claim that the Department of Defense and its officers, including the *de facto* President Barack Hussein Obama, as *de facto* Commander in Chief, together with Secretary of Defense Robert M. Gates, and Colonels Louis B. Wingate, Thomas D. MacDonald and Wanda L. Good as employees thereof, have acted illegally/i.e., without actual legal authority (valid chain of command) in issuing the original deployment order (Exhibit A) as well as its Revocation on July 14, 2009 (Exhibit ), or else failed to act in a *de jure* official capacity at all. Circumstances have changed so wildly every few days over the past week that it was impossible to have a complaint ready by the time of the first scheduled hearing on July 16, 2009, which was held in Columbus, Georgia, and the filing of a complaint is still premature as of Monday, July 20, 2009, but the matter is ripe for a TRO and preliminary injunction concerning retaliation and blacklisting of Plaintiff and his former employer & CEO SIMTECH and GRICE (whom Plaintiff

considers for all purposes to be involuntary Plaintiffs in this cause).

93.     In the alternative, Plaintiff submits that the Defendants have acted illegally and without constitutional right under color of legal authority by pretending that a lawful chain of command under the authority of a constitutionally qualified and elected President has been established pursuant to Article II, §§1-2 of the United States Constitution, when in fact, the current *de facto* Commander-in-Chief is not constitutionally qualified nor was he legally elected or appointed to succeed to the office of President of the United States.

## COUNT VI:
## ADMINISTRATIVE PROCEDURE ACT—5 U.S.C. §702, AND FEDERAL COMMON LAW apply to the PRESIDENT AS COMMANDER-in-CHIEF

94.     Plaintiff realleges ¶¶1-93 and incorporates the same by reference.

95.     Pursuant to 5 U.S.C. §702 this Application and Complaint may proceed and shall not be dismissed nor relief therein be denied on the ground that the Court may determine that this suit is filed against the United States or that the United States is an indispensable party[5].

96.     This court is required by federal common law to enter a Preliminary Injunction in this case and to enjoin Defendants' persecution of and retaliation against Plaintiff Stefan Frederick Cook for questioning the legitimacy of the chain of command predicate to the validity of to the orders contained in Exhibits A, B, and C for the following reasons:

---

[5] 5 U.S.C. §702 states in relevant part:
> The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.

97.   The United States Supreme Court has held that Federal rules are "necessary to protect uniquely federal interests". ***Texas Industries, Inc., v Radcliff Materials, Inc.***, 451 U.S. 630, 640 (1981), *quoting **Banco Nacional de Cuba v. Sabbatino**,* 376 U.S. 398, 426 (1964).

98.   Included in this category is the creation of federal common law to protect federal interests in international law, which are particularly relevant to the legitimacy of United States military presence and intervention in foreign countries, of which the Plaintiff herein will be an integral part and instrument if the orders set forth in Exhibit A are not enjoined from enforcement. *Id.*

99.   The issue or question raised by this suit is uniquely federal and properly (and in fact necessarily) subject to the exercise of federal power: the question whether the constitutional legitimacy of the chain of command under a constitutionally legitimate commander-in-chief pursuant to Article II, §§1-2 of the Constitution is essential to the maintenance of balance of powers and separation of powers under the constitution, and cannot be lightly dismissed in light of the Plaintiff's evidence that the *de facto* President of the United States is not only constitutionally unqualified, but procured his election by fraudulent and illegitimate means which may constitute a pattern of racketeering utilizing the apparatus of corrupt organizations in violation of 18 U.S.C. §1961 *et seq.*

100.   A substantive federal rule of law to govern this issue has never been developed, presumably because there has never been a serious challenge to the constitutional eligibility and legitimacy of any commander-in-chief of the United States Armed Forces prior to the apparent election of Barack Hussein Obama, but the novelty and uniqueness of this situation only underscores and does not

diminish the critical nature of the inquiry to be made. *See, e.g.,* Martha A. Field "Sources of Law: the Scope of Federal Common Law", **99 Harvard L. Rev. 881, 886 (1986)** and David J. Barron & Martin S. Lederman "The Commander-in-Chief at the Lowest Ebb—Framing the Problem, Doctrine, and Original Understanding," **121 Harvard L. Rev. 689, 712, 748 (2008).**

101.    There has never been a greater need to create federal law to safeguard federal interests than now, when the constitutional legitimacy of the President and by extension of all exercises of Presidential power are called into question. There are no direct precedents in all of United States History, there are no state rules which could reasonably be applied.

102.    To paraphrase the United States Supreme Court's holding in *Clearfield Trust Co. v. United States*, "the rights and duties of the United States" in regard to the constitutional legitimacy and qualifications of its highest officers "are governed by federal rather than" any other law.  **318 U.S. 363 at 366 (1943).**

103.    "The authority to" inaugurate the President and determine whether his orders are entered with legitimate authority or not have "its origins in the Constitutions and the Statutes of the United States and [is] in no way dependent upon the laws of" any particular state or foreign jurisdiction. *Id.* at 366-7.

104.    Few will dispute that the legitimacy of the President and of the Presidency itself is a matter of paramount concern (even exceeding that of the government issued commercial paper/checks at issue in *Clearfield Trust*) and importance to the several states and all foreign jurisdictions which may have to deal with the most powerful nation in the world.  As noted above, the legitimacy of the Chief

Executive and Commander-in-Chief affects the relationships of the Federal Government particularly with those nations in which this nation takes and implements action and policy by and through its military forces on foreign soil. *See also* Erwin Chemerinsky **Federal Jurisdiction, 5th ed. (2007)** 363.

105.    Thus, federal interests of incomparable dimensions exist which justify this court's creation of federal law and no challenged action instituted by the executive branch should be allowed to proceed until clear criteria have been established to guide this determination.   To hold otherwise would be to reduce the constitution to notions of *realpolitik* and a government of men asserting their power by force rather than laws.

106.    Plaintiff submits that in the absence of a constitutionally valid and legitimate commander-in-chief, he cannot serve to impose the military might and power of this country in a foreign land as a matter of principle.

107.    Plaintiff asks that he therefore be granted status as a conscientious objector on moral, religious and philosophical grounds, not that Plaintiff is a pacifist or in any way opposed to the use of military force to further the legitimate interests of the United States, but on the grounds that he cannot abide the notion that he might possibly be implementing by force the policy of a government whose executive power and commander-in-chief may have assumed power unlawfully and might have established themselves on a foundation of fraud, lies, and deceit.

## COUNT VI: THE CONSPIRACY TO DEFRAUD THE PEOPLE; THE PATTERN OF RACKETEERING AND CORRUPT ORGANIZATION

108.   Plaintiff Stefan Frederick Cook realleges ¶¶1-107 and incorporates all the material allegations and legal contentions of the same by reference as if fully copied and restated herein below.

109.   Plaintiff's lifelong business is and revolves around the United States Military.  Plaintiff has a proprietary interest in his status as an officer and in his good name and reputation.

110.   The evidence contained in Exhibit E shows that Barack Hussein Obama might have used as many as 149 addresses and 39 social security numbers prior to assuming the office of President.

111.   The social security number most commonly used by Barack Hussein Obama, is one issued in the state of Connecticut, the state where Barack Hussein Obama never resided and it shows him to be 119 years old.

112.   This coupled with the fact that Mr. Obama's grandmother, Madeline Dunham was a volunteer at the Oahu Circuit Court Probate Department and had access to the social security numbers of the deceased, constitutes circumstantial evidence casting serious doubt on the legitimacy of Mr. Obama and his claims of being born on US territory.

113.   Exhibit F, the expert affidavit of renowned forensic document examiner Sandra Ramsey Lines, states that the certification of live birth posted by Mr. Obama as verification of his legitimacy, cannot be verified as genuine, and original birth certificate , currently in the vault of the Department of Health of the state of Hawaii needs to be examined.

114. This doubt is further reinforced by the fact that the Hawaiian statute 338 allows **foreign born** children of Hawaiian residents to obtain Hawaiian birth certificates, that those birth certificates can be obtained **based on a statement of one relative only** without any corroborating evidence from the hospital; that "**late birth certificates**" (i.e. non-contemporaneously, post-facto, in two words "potentially fabricated") can lawfully, under this statute, be obtained at any time later in life.

115. That is of paramount concern, as Barack Hussein Obama's original birth certificate was never provided by the state of Hawaii, but only a statement that there is an original "long birth certificate" document on file.

116. The statement repeatedly provided by Hawaiian officials is quite simply incomplete, evasive, and without explanation of critical details: namely, whether it is a foreign birth certification or one obtained based on a statement of one relative only, or a late certification or amended one, obtained upon adoption by his stepfather. See Exhibit C: the Certification of Live Birth posted by Mr. Obama on the Internet, cannot be treated as genuine without examining the original on file with the Health department of the State of Hawaii.

117. In addition or in the alternative, Plaintiff submits that, absent clearly established and indisputable proof of constitutional right to serve as commander-in-chief, the army becomes merely a corps of chattel slaves under the illegitimate control of a private citizen, in violation of the Thirteenth Amendment and that this Plaintiff is entitled to constitutionally complete and sufficient proof of his commander-in-chief's eligibility and entitlement to serve in this capacity under Article I, §§1-2 prior to obeying orders from a man against whom mountains of

*Complaint for Damages, Declaratory Judgment, and*          32
*Rule 65 Application for TRO and Preliminary Injunction*

evidence now exist (Exhibits E and F, and additional evidence which can be provided at the Preliminary Injunction hearing or in conjunction) to show that Barack Hussein Obama obtained the office of President without legal qualifications, and further that he did so by and through a continuous pattern and program of fraud and deceit.

118.    There are several corrupt organizations involved, among them the Obama family, the Democratic National Committee, and the Democratic Party organized in several states that has forwarded Barack Hussein Obama's fraudulent campaign and quest for the Presidency.

COUNT VIII:
**CIVIL RIGHTS VIOLATIONS ACTIONABLE UNDER 42 U.S.C. §§1983, 1988(a)(a)**

119.    Plaintiff realleges ¶¶1-118 as if fully copied and restated herein.

120.    A long line of cases now exists to show that 42 U.S.C. §§1983, 1988 may be used to bring suit against Federal Officials for violations of constitutional rights, and 42 U.S.C. §1988(a) specifically authorizes courts to adapt or fashion common law remedies to prevent constitutional violations where no adequate remedy exists or is set forth in law---such specially fashioned remedies would include expressly empowering military officers to challenge orders based on constitutional defects in the chain of command by means of equitable judicial proceedings such as this one, and to permit injunctions against deployment where the chain of command is reasonably subject to question.

121.    Critical among the cases applying §1983 to suits against Federal (indeed, Military) officers, is the 1982 case of *Harlow v. Fitzgerald*, **457** U.S. **731** **(1982)** and closely related successor *Mitchell v. Forsyth*, **472** U.S. **511**

*Complaint for Damages, Declaratory Judgment, and*                    33
*Rule 65 Application for TRO and Preliminary Injunction*

(1985). These cases held that U.S. Government officials (such as Defendants in this case) could only claim qualified immunity, and that even qualified immunity was available to them only if they followed well-established law and norms of construction or interpretation of law.

122.   Plaintiff submits and here asks this Court to find, declare, and hold that the requirement that the President of the United States be a natural born citizen, set forth in Article II, §1 of the Constitution, creates a "clearly established ... constitutional right of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818.

123.   The right in question which Plaintiff asks this Court to define and recognize as a matter of first impression should be defined either as the unilateral right to disobey or the right to seek a judicial injunction against the enforcement of orders given on the unproven *de facto* authority of a government headed by a man against whom such circumstantial and direct evidence implies high likelihood of fraud as the affidavit of Neal Sankey (attached as Exhibit E) can be assembled from public records alone.

124.   In other words, Plaintiff asks this Court to rule, declare, and adjudge, pursuant to 42 U.S.C. §1988(a), that an officer of the Army of the United States (all officers!) must have the right to question apparently illegitimate authority in the courts or else in the course of his employment as an officer directly within the army chain of command or in both capacities and by both manners.  Current law does not establish any means of verifying the constitutional legitimacy of orders or the constitutional chain of command.

125.   Unlike the Federal officers in *Wilson v. Layne* who brought reporters

along with them when they executed search warrants (526 U.S. 703 [1999]), there IS a simple consensus of authority on the question of the requirement that the President be a natural born citizen sufficient to provide a basis for a reasonable army officer to doubt that his country's commander-in-chief might be accepted as legitimate outside the United States.

126.   This Court should rule, especially in light of the Executive Orders attached as Exhibit G, that a reasonable officer has the right to ask, indeed the duty to demand, under the principles of balance of powers and checks and balances of one branch of government against each and every other branch, that a federal court enjoin his overseas deployment until such time as the answers raised by Barack Hussein Obama's use of multiple addresses (almost all outside of any reasonable connection to his "official" life history) and social security numbers, including at least one social security number of a deceased person (Exhibit E).

127.   That this Plaintiff claims status as a conscientious objector must be clarified and emphasized in several ways: Plaintiff is no pacifist, nor an anti-war protester.  Plaintiff actually does want to go to Afghanistan and he verifies this fact, as he does this entire petition, under penalty of perjury (as required by Rule 65(b)(1).

128.   Plaintiff believes that his service in Afghanistan would be positive and serve the interests of world peace, the advancement of the people of Afghanistan, and the security of the people of the United States (and the allies of the United States in Europe and around the world).

129.   However, Plaintiff is also aware that the general opinion in the rest of the world is that Barack Hussein Obama has, in essence, slipped through the

guardrails to become President. The United States and her military, commanded by a man who has himself expressed pacifist and anti-military opinions, are the targets of derision and ridicule abroad.

130.   The grounds for grant of a Preliminary Injunction are well known: (a) likelihood of success on the merits, (b) balance of hardships, (c) irreparable injury to Plaintiff, and (d) public policy favors the issuance of injunctive relief.

131.   Plaintiff submits that, as to the likelihood of success on the merits---since this is a question of first impression, Plaintiff should be awarded the temporary injunction regardless of the lack of precedent, (a) because of the critical nature of any serious question concerning the constitutional legitimacy of the President as Commander-in-Chief, (b) because of the critical federal interest in this question, especially from the standpoint of military presence abroad, in potentially if nor certainly hostile territory, (c) because of the mounting evidence of fraud on the part of the *de facto* President shown in Exhibits E, F, & G, and (d) because of the well-known but as yet undecided question of Barack Hussein Obama's legitimacy, qualified immunity does not protect any officer from a potentially erroneous decision in this matter.

132.   Plaintiff's likelihood of success on the merits---at least on the question that standards need to be established for constitutional legitimacy of the President, and that all commissioned military officers who have taken the oath provided by 5 U.S.C. §3331 *(supra) must have the right (especially in time of domestic peace and no known imminent invasion or attack on the country) to demand proof of legitimate chain of command.

133.   As to balance of hardships, the Plaintiff Major Stefan Frederick Cook is a

Patriotic American who voluntarily joined the army and placed his life on the line for the defense of freedom and the rule of law ("truth, justice, and the American way of life") as his career.

134.   Plaintiff Cook found reason to doubt the legitimacy of the Commander-in-Chief, and demands proof, at the very minimum, of the Barack Hussein Obama's constitutional legitimacy and eligibility, which is made more acute by the evidence of multiple addresses and social security numbers attached as Exhibit E, but is of great concern when paired with the January 21, 2009, Executive Orders attached as Exhibit G.

135.   However, Barack Hussein Obama, in order to prove his constitutional eligibility to serve as President, basically needs only produce a single unique historical document for the Plaintiff's inspection and authentication: namely, the "long-form" birth certificate which will confirm whether Barack Hussein Obama was in fact born to parents who were **both citizens of the United States** in Honolulu, Hawaii, in or about 1961.

136.   It is no answer to show the short-form birth certificate which has no seals and is signed by no one and is produced, as most birth-certificates are, by computerized reproduction.

137.   In light of Exhibits E, the affidavit of Neal Sankey, as well as Exhibit F, Plaintiff submits under his sworn acknowledgement and verification below, that only final proof of Barack Obama's natural born citizenship by authentic, and authenticated, legal documents will prevent this Plaintiff from fear that he is serving a false master, a false commander-in-chief, a false President, and thereby violating the international laws of nations by acting without legitimate authority.

138.   However, as a practical matter, the mere execution by the President of a comprehensive medical release under HIPAA (Privacy Rule of the Health Insurance Portability and Accountability Act of 1996) would permit the Plaintiffs to obtain most of the information which they are seeking; separate releases of the President of his personal passport files and history maintained by the United States Department of State and Social Security Commission would resolve all other questions raised by Exhibits E, F, G.

139.   Accordingly, the President needs to sign three releases concerning his personal and private history prior to becoming President, and the President cannot possibly suffer any unjustified inconvenience or harm from the execution of these documents, especially since Presidents have historically disclosed their full medical histories as a routine matter of public interest and concern.

140.   The balance of equities, the balance of hardships, clearly favor the entry of this Temporary Restraining Order and/or Preliminary Injunction pursuant to 42 U.S.C. §s1983, 1988(a).

141.   From Plaintiff Major Cook's standpoint, if the history of World War II and the Nuremberg Trials teaches us anything, it is that no military officer should ever rely on "apparent" authority or "facial" legitimacy of orders.

142.   Every officer has an independent duty to use his conscience and evaluate the legitimacy of the chain of command under which he operates, and when reasonable doubts arise, the Courts should afford remedy and protection.

143.   If Plaintiff were to proceed to wage war on the people of Afghanistan, even the Taliban and other proven sponsors of terrorism, under the orders of an illegitimate President, Plaintiff runs the risk of acting as a *de jure* war criminal--

-not entitled to the protections of international law at all.

144.  All that is asked of the President is that he humbly acknowledge and produce his true and complete "original" birth certificate.

145.  So long as this complete document in form and substance clearly establishes and proves the Barack Hussein Obama's status as a "natural born" citizen, within the true and original meaning of that term as established by the precedents of the American Courts, the President and the Presidency will not only have suffered no harm, but will have reaffirmed the faith of the people in the rule of law as dominating all men, including the President of the United States.

146.  As discussed above, the balance of the equities and hardships shows that, so long as the President is and has always been honest and truthful about his place of birth and parentage, he will suffer no harm at all---and if the President has not always been honest and truthful about his origins, then he will suffer no unjustified harm or injury as a result of the necessary disclosures.

147.  However, the potential harm to the Plaintiff if relief is denied is that he will be required to serve heavily burdened by a doubtful and unwilling conscience, which in itself is and ought to be repugnant to a free society. Involuntary servitude was abolished in 1865, and this Court should not underestimate the crisis of confidence which an order of unquestioning obedience will have, nationwide, on the legitimacy and "full faith" which can be accorded to its officers and their actions.

148.  A man who doubts his commander-in-chief cannot be a good soldier, unless he is instructed that "following orders" is the highest virtue of all, and surely the Nuremberg Trials, and the Trial of Adolf Eichman in Jerusalem, have

proven this position false and dangerous to civilization and the moral and ethical administration of government. This harm, this injury to conscience, is not speculative, it is not remote, it is immediate and without any legal remedy of damages or later honor bestowed as a result of service.

149.   Perhaps slightly more remote and speculative, but possible, plausible, and by no means without precedent in the past century is the possibility that if THIS Plaintiff is not allowed access to the truth, someone else may yet expose that the current *de facto* President serves in mockery and defiance of the Constitution, and that all his military adventures abroad will eventually be classified as private, slave armies engaged in private, piratical warfare unsanctioned by International Law and subject this Plaintiff to prosecution as a war criminal.

150.   As far as public policy goes, allusion has already been made to the crisis of public confidence---even if only 10-20 percent of the American people believe that Barack Hussein Obama is lying about or hiding the details of his true place of birth or national origins---this Court would be doing the public interest a great service by protecting this Plaintiff's right to conscientiously object based on his reasonable and well-founded doubts concerning the chain of command originating from a questionable commander-in-chief.

151.   Furthermore, judicial resolutions of festering doubts and lack of confidence can diffuse social tension and re-establish confidence in the rule of law more generally.

152.   Plaintiff points out that there was another time in United States history when officers of the military were forced to make a choice whether to follow the central government or their consciences. That time in United States history was

in 1861 when some of the finest officers of the United States Army felt that they and their constitution had been betrayed by the central government, and that is how Mexican War heroes Jefferson Davis and Robert E. Lee, among so many others, became the leaders of the Confederate States of America.

153.   There were no lawsuits filed at that time---5 U.S.C. §702 and 42 U.S.C. §§1983-1988 had not yet been enacted.   But the public interest is served by permitting Army officers to seek judicial protection and assistance when they question the legitimacy and authority of the commander-in-chief with regard to moral and constitutional issues.

154.   There are no "competing" governments now---no seceding states, however over 36 states have either passed or considered the bills of Sovereignty lately, which can be a step towards secession and a sign of vast dissatisfaction with the Federal government and the President.

155.   In historical hindsight it is easy to say the Jefferson Davis and Robert E. Lee hurt their own states of Mississippi and Virginia by supporting secession.

156.   In historical hindsight it is easy to say that even the pro-slavery cause might have been better served by acquiescence under Abraham Lincoln, who (absent secession and civil war) lacked any realistic legal power, as President in 1861, to interfere with slavery in any state or territory where it already existed.

157.   Plaintiff submits that judicial resolution of festering sores such as occur when people feel they cannot trust their leaders to follow the law, to live by the law, and to respect the concerns of all the people, especially when it will cost their leaders almost nothing to restore or bolster confidence, is a major public policy reason why this Application for Preliminary Injunction should be granted.

## MOOTNESS AND JUSTICIABILITY OF APPLICATION FOR INJUNCTION UNDER RULE 65

158.   This Complaint for Damages, Declaratory Judgment, and Application for Application for Preliminary Injunction will be served on all parties named, but as required, will in addition be served on the United States Attorneys for the Middle Districts of Florida as required by law, Robert M. Gates, the Secretary of Defense and, of course on the *de facto* President Barack Hussein Obama.

159.   The timing of Plaintiff Stefan Frederick Cook's receipt of the rescission of his orders on July 14, 2009, and the sudden the cancelation of his imminent deployment from Fort Benning to Afghanistan, do not render any part of this action declaratory judgment and injunction moot.

160.   In fact, because the orders could be reinstated at any time, there is now more than adequate time to render effective relief.

161.   Effective injunctive relief is still required and can still be ordered at this stage for the Plaintiff, and all those similarly situated as Officers in the United States Armed Forces, including all those subject to recall or mobilization to active duty at any time in the future. *See Bernhardt v. County of Los Angeles*, 279 F.3d 862, 871 (9th Cir.2002).

162.   Declaratory Judgment as outlined under the several theories above will address a series of questions of first impression in the annals of United States History, but they are justiciable in that this Court is capable of rendering decisions which will benefit the Plaintiff and all parties similarly situated.

163.   Article III, Section 2 of the Constitution limits federal court jurisdiction to "cases" and "controversies."

*Complaint for Damages, Declaratory Judgment, and Rule 65 Application for TRO and Preliminary Injunction*          43

164. This case or controversy requirement exists through all stages of federal judicial proceedings. *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).

165. A number of doctrines have developed, however, to permit courts to review a case in which it is no longer possible to remedy the particular grievance giving rise to the litigation.

166. One is the exception to the mootness doctrine for violations "capable of repetition, yet evading review." *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). This is such a case.

167. It is most unlikely that any given individual could have his constitutional claim decided on appeal after he is ordered to duty but before his actual deployment.

168. In *Gerstein* the Supreme Court held the exception to the mootness doctrine for violations "capable of repetition, yet evading review" applied because the constitutional violation was likely to be repeated but would not last long enough to be reviewed before becoming moot. *Id.*

169. An order to a reserve officer to be deployed in active duty is ordinarily even more temporary than the pretrial detention at issue in *Gerstein*. This case evades review for essentially the same reason (except that the evasion is not inherent, but artificially constructed by the Defendants as an evasive strategy).

170. The Plaintiff could not have brought the challenges to this court before the harm of issuance of illegal orders without proper chain of command could be addressed or resolved judicially.

171. As noted above---the Plaintiff, acting by and through counsel, sought

*Complaint for Damages, Declaratory Judgment, and*                  44
*Rule 65 Application for TRO and Preliminary Injunction*

administrative review of the chain of command in substantial accord with Article 138 prior to filing suit, and was told that there WAS no remedy.

172.  This immediate situation giving rise to this challenge also is capable of repetition. Plaintiff Cook can only assume that issuance of orders to mobilize will be recurring on the part of these defendants who will immediately REVOKE those orders if challenged on grounds of the President's lack of constitutional qualifications. *See O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

173.  This case is therefore not readily distinguishable from an abortion case, the classic case capable of repetition yet evading review, because we can assume a woman can become pregnant again. *See generally Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

174.  The difference is that in this case it was the Defendants (especially the Department of Defense) who performed the abortion by revoking the order to deploy rather than the Plaintiff.

175.  It cannot be emphasized sufficiently, precisely because it has been so recklessly bandied about on the internet, that Major Stefan Frederick Cook has actually sustained an INJURY in this case as a direct result of his INABILITY to deploy to Afghanistan.

176.  Major Stefan Frederick Cook, as shown by his resumes in Exhibits H and I, is a career military officer with extensive experience in combat zones and abroad, and he WANTED to go to Afghanistan to advance his career and to serve his country in the Global War on Terrorism.

177.  It is a supremely unjust irony that the United States District Judge Land in

Georgia treated this matter as MOOT merely because the order to deploy was revoked.

178. The primary problem was and remains and will always be until the questions posed by this Complaint have been answered not the order to deploy itself, but the chain of command behind it, and the precarious predicament in which the lack of legitimacy in government places every officer and enlisted man and woman serving in the United States Armed Services overseas and abroad today.

179. The problem with the chain of command was not even temporarily insulated from judicial review or rendered moot by the actions of the Department of Defense in revoking Plaintiff's orders: rather, the problem with the chain of command was repeated and aggravated.

180. So Plaintiff Major Stefan Frederick Cook's challenge to the legitimacy of the Commander-in-Chief, and to the lack of administrative and/or judicial avenues of legal or constitutional challenge to the Constitutional invalidity of the Commander-in-Chief, is not only not moot, but has by the events of the past two weeks been rendered more critical.

181. Some cynics might say that Barack Hussein Obama's refusal to document his personal and medical history once challenged has amounted to an abortion of the legitimacy of the American Presidency, and of the confidence of the people, especially the men and women of the United States Armed Forces, who serve directly under his *de facto* Command and long for a show of clear and convincing *de jure* validation of his commitment to the Constitution and Rule of Law as applied to all citizens.

182. This makes no material difference, however, because a future mobilization order assuredly will surely be issued against some officers of the United States Army, and the shackling policy would similarly escape review.

183. Furthermore, it appears to be a policy of the Federal Government to avoid answering questions about *de facto* President Barack Hussein Obama's constitutional qualifications to occupy the White House and serve as commander-in-chief.

184. Thus, this case is capable of repetition when because defendants are challenging an ongoing government policy while the government is avoiding review by rescinding its orders whenever challenged, but leaving the problems underlying those challenges unresolved. *Oregon Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1118 (9th Cir.2003).

185. In *Oregon Advocacy Center,* the plaintiffs alleged that the state mental hospital, which was charged with evaluating and treating mentally incapacitated defendants, refused to accept the defendants on a timely basis. *Id.* at 1105-06. The plaintiffs challenged a state policy that results in the delays. *Id.* at 1118.

186. Although the particular situation precipitating a constitutional challenge to a government policy may have become moot, the case does not become moot if the policy is ongoing. *Id.* "The continued and uncontested existence of the policy that gave rise to [the] legal challenges forecloses [the] mootness argument." *Id.*

187. The D.C. Circuit similarly held that when a complaint challenges an acknowledged or apparent government policy, the government cannot prevail by arguing that the controversy became moot when the particular situation at issue resolved itself. *Ukrainian-American Bar Ass'n v. Baker,* 893 F.2d 1374, 1377

(D.C.Cir.1990). The defendants in this case are challenging what they allege to be an ongoing government policy of stonewalling and obfuscation.

188.  The United States District Courts must not reward the Department of Defense for "Evasive Action" in this case, or for "taking the initiative" in preventing substantial issues from coming before the Courts for resolution. The United States District Court for the Middle District of Florida is the proper venue and forum for this dispute, and the dispute is ripe and no part of the real question is moot, or likely to become moot any time soon.

189.  As a practical matter, as has already been noted, this case is materially similar to a class action in which the class representative's claims may become moot, but there are members of the class whose claims are not moot.

190.  It is actually quite possible that this case will be converted into a class action under Rule 23 of the Federal Rules of Civil Procedure. The Supreme Court has held that under the capable of repetition, yet evading review doctrine, the termination of a class representative's claim does not moot the claims of other class members. *See Gerstein,* 420 U.S. at 110 n. 11, 95 S.Ct. 854.

191.  This holding applies outside of the class action context when the circumstances of the case are analogous to those found in class action cases. *Oregon Advocacy Ctr.,* 322 F.3d at 1117; *see also Gerstein,* 420 U.S. at 111 n. 11, 95 S.Ct. 854.

## CONCLUSION

Plaintiff Stefan Frederick Cook submits, and hopes, that the Court will recognize that his present Complaint for Damages, Declaratory Judgment, and Rule 65 Application for TRO and Preliminary Injunction, however focused on his doubts about the qualifications of the Comander-in-Chief, is about more than just Obama. The legal theories in this case, the requested relief, all revolve around an officer's duty to uphold the Constitution, his duty to question the lawful nature and status of orders according to his oath as an officer--and the role of the armed forces as a critical element of the balance of power in a constitutional government.

In the post-Nuremberg era, the era of International Law and the United Nations, the army cannot merely be subservient to the President, a mere tool or blindly subservient instrument. The United States Army, acting by and through its officers, is one of the most powerful forces IN THE WORLD, and for an Army NOT to have an independent conscience and capacity to question its role and position would be a very dangerous thing---which the founding fathers foresaw (and therefore discouraged standing armies). Since we now have a standing army, we need to give the officers constitutional status and empower them to use their moral consciences wisely, a duty and power their oaths suggest they already have, but the exercise of which role has never previously been contoured judicially.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court will enter a Preliminary Injunction upon full-hearing, waiving all bonds or other financial requirements. Specifically, Plaintiff prays that this Court

(1) recognize and respect Plaintiffs' status, and the status of all persons similarly situated in the United States Army, as conscientious objectors based on legitimate doubts concerning the constitutional qualifications and eligibility of the *de facto* President and Commander-in-Chief, Barack Hussein Obama,

(2) enjoin Defendants Robert M. Gates, as well as Colonels Louis B. Wingate, Wanda L. Good and Thomas D. MacDonald from issuing any order to Plaintiff or any other officers persons similarly situated to Afghanistan or anywhere on active duty at all until

(3) such time as the constitutional qualifications and eligibility of Barack Hussein Obama to serve as President and Commander and Chief have been established by clear and convincing evidence (which standard of proof befits a constitutional requirement, especially in light of the confusing and conflicting circumstantial evidence set forth in Exhibits E and F).

Further, Plaintiff Prays that this Court will declare and adjudge

(4) that all commissioned officers have a duty, pursuant to their oath under 5 U.S.C. §3331 as well as under the Uniform Code of Military Justice, to inquire as to the lawfulness or legality of all orders received, and that the army must either

(5) that this Court fashion, as a matter of positive preliminary injunction and final permanent injunction, order the Department of Defense (pursuant to

*Complaint for Damages, Declaratory Judgment, and*                              50
*Rule 65 Application for TRO and Preliminary Injunction*

the powers of the Court under 18 U.S.C. §2201-2202 NS 42 U.S.C. §§1983 and 1988(a), among other sources) to fashion, implement, provide, and sustain procedures affording all officers with an administrative remedy wherein they may challenge ALL defects in orders, whether arising from considerations of statutory civilian or military law, the customs of war and military usage, the Constitution of the United States, or international law as established by treaties to which the United States is bound as a ratifying party.

Still Further, Plaintiff Prays that this Court will declare and adjudge

(6)     that no officer should ever be subject to formal discipline or informal retaliation, including discrimination in civilian employment, for lawful exercise of his First Amendment Right to Petition for Redress of Grievances, and his Ninth Amendment Right otherwise to conscientiously object in a peaceful manner and ethically protest moral, legal, ethical, or constitutional defects in orders or army policy according to the dictates of his conscience;

(7)     that Plaintiff Stefan Frederick Cook was wrongfully subjected to such retaliation as a result of his exercise of his First and Ninth Amendment rights and that

(8)     Plaintiff Stefan Frederick Cook is entitled to reinstatement in his former (as of exactly ten days prior to the filing of this Application for TRO and Preliminary Injunction in the Middle District of Florida) civilian employment at SIMTECH, INC., and that

(9)     Defendants Department of Defense, Defense Security Services Agency, Robert M. Gates, and Barack Hussein Obama be permanently enjoined from blacklisting or otherwise retaliating against SIMTECH, INC., or its CEO

***Complaint for Damages, Declaratory Judgment, and***                              51
***Rule 65 Application for TRO and Preliminary Injunction***

Larry Grice or any other officer or employee of SIMTECH, INC., for their association with or continued employment of Plaintiff Stefan Frederick Cook, and

(10) that Defendants (or Involuntary Plaintiffs) Larry Grice and SIMTECH, INC., be positively enjoined to rehire Plaintiff Stefan Frederick Cook in his former position, and that these Defendants be protected in the security of their government contracts and status as government contracts so long as their performance on such contracts warrants protection and retention---without regard to any employees exercise of First and Ninth Amendment rights to petition and protest governmental customs, practices, or policies having the force or effect of law, including unlawful appointments and elections leading to possibly fatal flaws in the Military Chain of Command,

(11) that Plaintiff have all his attorneys fees and reasonable costs of suit, and all such other and further relief as this Court may allow, pursuant to 28 U.S.C. §2201-2201 and 42 U.S.C. §§1983, 1988(a).

Respectfully submitted,

FRIDAY, July 24, 2009

By:_____
Orly Taitz, DDS, Esq.
California Bar ID No. 223433
FOR THE PLAINTIFF
**Major Stefan Frederick Cook**
**APPLICATION TO APPEAR PRO HAC VICE PENDING IN M.D.FLA.**
26302 La Paz, Suite 211
Mission Viejo Ca 92691
29839 S. Margarita Pkwy
Rancho Santa Margarita Ca 92688
Ph. W.: 949-586-8110 Cell: 949-683-5411
Fax 949-586-2082
E-MAIL: dr_taitz@yahoo.com

AND BY LOCAL COUNSEL:
INGER GARCIA-ARMSTRONG

_____

2506 NE 30th Street
Fort Lauderdale
Florida 33306
Florida Bar ID 106917
Tel: 954-894-9962
Fax: 954-446-1635
E-MAIL: ATTORNEY@INGERGARCIA.COM

## PLAINTIFF'S VERIFICATION

On this Friday the 24th day of July, 2009, the undersigned Plaintiff Major

Stefan Frederick Cook appeared in person before me and, having been by me duly

administered the oath as required by law, and further having been advised that

he made all statements under penalty of perjury, he then and there did depose

himself and state that he had read the above-and-foregoing Complaint for

Damages, Declaratory Judgment, and Rule 65 Application for Temporary

Restraining Order and Preliminary Injunction to restore his civilian employment

and enjoin retaliation or blacklisting against himself or his employer SIMTECH,

INC., or its CEO Larry Grice.

Plaintiff Major Cook stated that he had used all lawful means, but

exclusively lawful administrative and judicial means to protest his deployment to

Afghanistan under orders of a chain of command headed by Barack Hussein

Obama, that these orders had been revoked unlawfully under that same chain of

command, and that Plaintiff had been terminated within 3 business days of filing

said petition for redress of grievances on July 14, 2009, without any other

possible or suggested cause.

Furthermore, Plaintiff stated that he had personally read and reviewd the

above-and-foregoing application for temporary restraining order and/or

preliminary injunction and then and there personally verified that all the factual

statements contained therein.

As required by Rule 65 the same Plaintiff Major Stefan Frederick Cook

also stated that Exhibit A is a true and correct copy of his orders of deployment to

active duty, requiring him to report to MacDill Airforce Base in Tampa on July 15

and from thence be transferred to Fort Benning, Georgia, and from thence be deployed in Afghanistan. Exhibits B and C are true and correct copies of the revocation of these orders and e-mail transmittals of the same by and through the same chain of command headed by Barack Hussein Obama as *de facto* Commander-in-Chief of the United States Armed Forces. Exhibit D is a true and correct copy of the "Army Values" card Plaintiff carries at all times, and Exhibits H and I are true and correct copies of his civilian resume and military *curriculum vitae*.

Plaintiff affirmed and acknowledged that he conscientiously objected to serving under orders from the armed forces of the United States on active duty if and as currently headed by Barack Hussein Obama, fearing that the President obtained and held his office under false pretenses and fraudulent statements concerning his constitutional eligibility, personal history, and background, and that Plaintiff would be acting in violation of international law by engaging in military actions outside the United States under this President's command, and that Plaintiff would thus be simultaneously unable to perform his duties in good conscience and yet be simultaneously subjecting himself to possible prosecution as a war criminal by the faithful execution of these duties.

In conclusion, Plaintiff affirmed and verified that he submitted this Complaint for Damages, Declaratory Judgment, and Application for Preliminary Injunction solely for the purposes and reasons stated, and not for any fear or reluctance to serve his country in the armed forces, but purely and simply from his complete distrust of the Commander-in-Chief and the constitutional qualifications of this *de facto* President to lead and serve the army, including

but not limited to his legitimate authority and power to establish a *de jure* chain of command.

This verification and acknowledgement was done and executed on this 24th day of July, 2009, in Tampa, Hillsborough County, Florida.

Major Stefan Frederick Cook, U.S. Army

### NOTARY'S JURAT

As aforesaid, Plaintiff Stefan Frederick Cook appeared in person before me on this Friday, July 24, 2009, to acknowledge, execute, sign under oath, and verify the above and foregoing Application for Preliminary Injunction as Required by Rule 65 of the Federal Rules of Civil Procedure.

I am a notary public, in good standing, authorized and qualified by the State of Florida to administer oaths.

Notary Public, State of Florida,
Tampa, Hillsborough County

NOTARIAL SEAL AFFIXED ABOVE

Printed Name of Notary: _TARA OREE_, address: _203 Apollo Beach Blvd_
_Apollo Beach, FL .33572_

My Commission Expires: _March 29, 2013_



## CERTIFICATE OF SERVICE

The above-and-foregoing Application for Preliminary Injunction was served by facsimile and/or hand delivery on Friday, July 24, 2009, on the following parties:

Colonel Thomas D. MacDonald
Garrison Commander, Fort Benning, Georgia
Hugh Randolph Aderhold , Jr.
PO Box 1702
Macon , GA 31202-1702
478-621-2728
Email: Randy.Aderhold@usdoj.gov

Col. Louis B. Wingate
**U. S. Army Human Resources Command-St. Louis**
**1 Reserve Way, St. Louis, MO 63132** .

Dr. Robert M. Gates, Secretary of Defense, by and through the Pentagon:
1000 Defense Pentagon  Washington, DC 20301-1000

MAJOR REBECCA E. AUSPRUNG
Department of the Army
U.S. Army Litigation Division
901 North Stuart Street, Suite 400
Arlington, VA 22203-1837
Tele: 703-696-1614
Email: Rebecca.Ausprung@us.army.mil

President Barack Hussein Obama,
At
The White House
1600 Pennsylvania Avenue
Washington, D.C. 20500

by and through the Attorney General of the United States, Eric Holder, at

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

and Maxwell Wood, United States Attorney for the Middle District of Georgia, at

U.S. Attorney's Office    Gateway Plaza    300 Mulberry Street, 4th
Floor    Macon, Georgia 31201    Tel: (478) 752-3511

And also at:

***Complaint for Damages, Declaratory Judgment, and***                    57
***Rule 65 Application for TRO and Preliminary Injunction***

Columbus Division  ☐1246 First Avenue  ☐SunTrust Building, 3rd Floor
☐Columbus, Georgia 31901  ☐Tel: (706) 649-7700.

**A. Brian Albritton**
**United States Attorney for the**
**Middle District of Florida**
**400 N. Tampa Street, Suite 3200**☐
**Tampa, Florida 33602**☐
**Phone: (813) 274-6000**☐
**Fax : (813) 274-6358**

_____
Attorney Orly Taitz, Esquire,
For the Plaintiff Major Stefan Frederick Cook